IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | CHAPTER 13 |
| CINDY BICE, | Case No. 05-12977 (BLS) |
| Debtor. | |
| CINDY BICE, | |
| Plaintiff, | |
| v. | Adversary No. 06-50505 (BLS) |
| RICHARD EWING d/b/a R.L. EWING CO., | |
| Defendant. | |

**OPINION**[1]

Before the Court is an adversary proceeding brought by Cindy I. Bice ("Ms. Bice") against Richard L. Ewing ("Mr. Ewing") to determine the value, if any, of Mr. Ewing's second-priority lien on her property. She seeks a declaration from this Court stating that Mr. Ewing's lien on her property is wholly unsecured so that she may treat it as such under her Chapter 13 plan (the "Plan"). For the following reasons, the Court rejects Ms. Bice's argument and finds that Mr. Ewing's claim is fully secured.

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

# I. BACKGROUND

On September 1, 2000, Ms. Bice entered into a construction contract (the "Contract") with Mr. Ewing. The Contract required Mr. Ewing to build a house (the "House") on a lot Ms. Bice owned in Seaford, Delaware, in exchange for $96,500. Mr. Ewing began building the House shortly after the Contract's execution and construction initially progressed without incident. During the last month of construction, however, a contentious relationship developed between the parties and, in February 2001, Mr. Ewing stopped work on the House, asserting that he had fulfilled his obligations under the Contract. Ms. Bice disagreed and withheld the final scheduled payment of $10,000 to Mr. Ewing.

## A. Pre-Bankruptcy Litigation

On April 17, 2001, Mr. Ewing filed a complaint in the Superior Court for the State of Delaware, alleging that Ms. Bice owed him $19,088.72 for breach of contract and quantum meruit. Ewing v. Bice, No. 01L-04-013, 2001 WL 880120, at *1 (Del. Super. Ct. July 25, 2001). This amount reflected $10,000 for the final draw, $6,588.72 for "extras," and $2,500 for connecting the House to Seaford's water and septic lines. Id. Mr. Ewing alleged that he had completed ninety-nine percent of the construction on the House and had offered to repair a number of punch-list items that Ms. Bice had found unsatisfactory, but when he attempted to make the repairs, Ms. Bice ordered him from the property. Id.

Ms. Bice answered Mr. Ewing's complaint and asserted affirmative defenses and counterclaims against Mr. Ewing. Id. The counterclaims were for (i) breach of contract with resulting damages of $15,000, (ii) conversion with resulting damages of $15,000, (iii) conversion with resulting damages of $86,500, (iv) violation of the Deceptive Trade Practices Act ("DTPA") with resulting damages of $86,500, and (v) violation of the Consumer Contracts Act ("CCA") with resulting damages of $259,500. Id. Mr. Ewing responded to these counterclaims by filing a motion for summary judgment on Ms. Bice's DTPA and CCA claims. Id. By opinion dated July 25, 2001, the Delaware Superior Court granted summary judgment in favor of Mr. Ewing on the DTPA and CCA claims. Id. at 9.

Trial on the merits was held over four days in late 2003. Ms. Bice represented herself throughout the trial. In the months following the trial, the parties submitted closing briefs to the court. On February 5, 2005, the Delaware Superior Court issued a letter opinion disposing of the matter. Ewing v. Bice, No. 01L-04-013-JEB (Babiarz, J.) (Del. Super. Ct. filed Feb. 25, 2005). Judge Babiarz found that Mr. Ewing had substantially performed his obligations under the Contract. Id. at 2. In reaching this finding, the court reasoned:

> A structure is substantially completed when it can be put to the use for which it is intended even though comparatively small items remain to be completed. That

> the house constructed by Plaintiff is a habitable dwelling is evidenced by the fact that Defendant has lived there since December 2000. She has even spent money on substantial improvements like an in-ground swimming pool. The house is occupied under a temporary certificate of occupancy issued to allow defendant to move in before completion. A final certificate has not been issued because the defendant has not requested it.

Id. (citations omitted). The trial court therefore concluded that the balance of $10,000 was due under the contract. Id. In addition, the court found that the Ms. Bice owed Mr. Ewing $3,205.30 in "extras." Id. at 2-3. Thus, Mr. Ewing was awarded a judgment in the amount of $13,205.30 plus interest at the legal rate and costs. Id. at 4. The court disallowed or rejected Ms. Bice's remaining counterclaims against Mr. Ewing on the ground that she had not carried her evidentiary burden of proof on those counterclaims. Id. As of the date hereof, the judgment remains outstanding, and the record reflects that Mr. Ewing has recorded his judgment as a second-priority lien against the House. (Compl. ¶ 7 [Docket No. 1]; Answer ¶ 7 [Docket No. 6].) Mr. Ewing presently asserts that, with interest, his claim is $25,973.34.

B. The Adversary Proceeding

On October 4, 2005 (the "Petition Date"), Ms. Bice filed a petition for relief under Chapter 13 of the Bankruptcy Code. Then, on February 14, 2006, she filed a complaint (the "Complaint"), thereby commencing this adversary proceeding. Through the adversary proceeding, Ms. Bice seeks to obtain an order voiding Mr.

Ewing's security interest in the House. Ms. Bice asserts that the House is subject to a first-priority mortgage held by Discover Bank in the amount of $75,758.00. Ms. Bice further asserts that the House is worth only $60,000 because of defects in its construction and, consequently, Mr. Ewing's second-priority mechanic's lien is wholly unsecured. Ms. Bice has filed, and is currently performing under, a Chapter 13 plan that treats Mr. Ewing's claim as wholly unsecured.

On March 22, 2006, Mr. Ewing filed an answer to the Complaint. Mr. Ewing argues that the value of the House exceeds $101,731.34, which is the total amount of his $25,973.34 asserted secured claim and Discover Bank's $75,758.00 claim combined. He therefore asserts that his claim is fully secured by the House and that it must be treated as such under the Plan.

On June 19, 2008, this Court held a hearing (the "Hearing") to determine the value of the House. At the Hearing, the Court heard the testimony of four witnesses: (i) Michael Mahetta, (ii) Alfred L. Brumbley, (iii) Ms. Bice, and (iv) Mr. Ewing. In addition, the Court received substantial documentary evidence from both parties. The matter has therefore been fully briefed and argued. It is ripe for decision.

## II. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(K).

## III. DISCUSSION

The sole purpose of the Hearing was to determine the value of the House.[2] A not insignificant portion of the evidence presented at trial, however, focused on who had wronged whom and when. While the Court recognizes that both Ms. Bice and Mr. Ewing have grown increasingly frustrated with each other over the course of their now seven-year-old dispute, such testimony is only relevant to the extent that it informs the Court of the House's current condition.[3] This adversary proceeding is not a forum for the Debtor to re-litigate or revisit the matters that have already been decided by

---

[2] The Court will value the House using the evidence supplied by the parties. This evidence was gathered at dates ranging from 2005 through 2008. Neither Ms. Bice nor Mr. Ewing have advocated the use of any particular date at which to determine the value of the House. In addition, the Third Circuit has acknowledged that the issue of "what date a court should use to determine whether a mortgage is wholly unsecured" is an open one. McDonald v. Master Financial, Inc. (In re McDonald), 205 F.3d 606, 615 (3d Cir. 2000). The Court infers from the parties' apparent indifference to this timing issue that the value of the House as of the Petition Date does not materially differ from the value of the House as of the date of the Hearing.

[3] For example, Ms. Bice spent some time at trial describing how an improperly installed water pipe in an upstairs bathroom had burst and had flooded the house. However, she then testified that the damage caused by the flood has since been fully repaired. As the flood damage no longer exists, the fact that this particular incident occurred should have no bearing on the House's value and testimony indicating who caused that flooding is irrelevant.

the Superior Court.

A. The House

The House is a two-story, suburban home with three bedrooms, two and a half bathrooms, and 1,832 square feet of total living space. It boasts an attached two-car garage and an in-ground swimming pool. Photographic evidence submitted at the Hearing reflects that the House's exterior and landscaping are well maintained by Ms. Bice.

B. The Appraisal

Mr. Brumbley is an appraiser with twenty years of professional experience valuing residential properties. At the Hearing, Ms. Bice called Mr. Brumbley to testify regarding his appraisal of the House, which he performed in August 2005 at Ms. Bice's request. In addition to his testimony, his written report (the "Appraisal Report") was submitted to, and received by, the Court as evidence. Mr. Brumbley testified that, in his professional opinion, the value of the House is $60,000. He arrived at this value using two approaches: (i) the "Cost Approach," and (ii) the "Sales Comparison Approach."

To value the House using the Cost Approach, Mr. Brumbley added the value of Ms. Bice's lot and the depreciated value of the improvements made to that lot, such as the pool and the House itself. To value the House using the Sales Comparison Approach, Mr. Brumbley examined the sale prices of several recently sold

properties comparable to the House and then used these prices to estimate the value of the House. In each case, Mr. Brumbley deducted $150,000 from what would otherwise be the House's estimated value. Mr. Brumbley admitted that it was an unusual step for him to take such a large deduction when valuing a residential property such as Ms. Bice's. Nevertheless, Mr. Brumbley made this deduction because he relied on a report (the "Construction Report") furnished to him by Ms. Bice.

The Construction Report identified the House as having substantial structural problems and other inadequacies which would impact its safety, utility, and marketability. The Construction Report stated that it would cost over $124,000 to repair the House's defects and, based upon his experience, Mr. Brumbley estimated that a potential purchaser would need to receive an additional amount of $25,000 to be induced to buy a house with such defects. Accordingly, Mr. Brumbley deducted $150,000 from the House's value when preparing his appraisal. Without the $150,000 deduction, Mr. Brumbley would have valued the House at approximately $210,000.

C. The Construction Report

The Construction Report had been prepared by Mr. Mahetta, who also testified at the Hearing on behalf of Ms. Bice. Mr. Mahetta is a licensed homebuilder and has built homes for the past twenty-eight years. At the Hearing, Mr. Mahetta credibly described a

significant number of substantial defects in the construction of the House, including that (i) the foundation of the house is too low to the ground; (ii) the crawl space is not properly excavated; (iii) the garage ceiling is not built with the proper dry wall; (iv) the steps in the garage do not meet code and are missing a handrail, (v) some doors in the house swing the wrong way, (vi) ducts are improperly installed throughout the house, (vii) the floor under the fireplace is not properly supported, (viii) the window in the master bathroom is installed backwards, (ix) the master and main bathroom tubs both lack an access panel for the whirlpool tub, (x) the electrical system does not meet code standards, (xi) the rear outside balcony is not supported properly, (xii) the laundry room floor is not level, (xiii) other floor areas lean more than normal, (xiv) the front steps do not meet code, and (xv) the master and main bathtubs need to be supported. In short, Mr. Mahetta detailed rather poor work done by Mr. Ewing when constructing the House.[4]

Mr. Mahetta estimates that the it would cost $124,704.11 to repair all of House's defects and he recommends, among other things, lifting the House so that it is higher off of the ground.

---

[4] As noted, Ms. Bice represented herself in the Superior Court trial and asserted claims relating to all of the defects described above. The Superior Court ruled that she had not provided sufficient evidence and so disallowed those claims. Under principles of res judicata, this Court cannot revisit those affirmative claims or otherwise allow a direct recovery against Mr. Ewing by the Debtor.

Mr. Mahetta further testified that approximately seventy-five to eighty percent - or $93,528.08 to $99,763.29 - of his $124,704.11 estimate is attributable to costs associated with lifting the house. This amount is roughly equal to the entire amount initially spent to build the House.

D. <u>Lifting the House is an Inappropriate Measure</u>

The Court finds that lifting the House is a drastic and unnecessary remedy in this case. The testimony adduced at the Hearing from both Mr. Mahetta and Mr. Ewing reflects that lifting a house is a costly process with a number of attendant risks. All electrical and plumbing connections must be disconnected and then the entire house must be lifted using hydraulic jacks. The House remains suspended while work is performed under it. The House is then lowered to its new, higher resting position. In the words of Mr. Mahetta, lifting a house is a "major job."[5] During this process, dry wall can crack, plumbing connections can rupture, electrical lines can stretch, and floor tiling can become damaged.

Mr. Ewing credibly testified at the Hearing that more cost-efficient and less risky ways of repairing many of the problems identified by Mr. Mahetta exist. Mr. Ewing suggested, for instance, that instead of lifting the House, one could excavate

---

[5] Mr. Mahetta testified on cross-examination that he had never actually lifted a house before in his twenty-eight years of residential construction experience.

dirt from under the House to make the House higher off of the ground. Misaligned doors and windows can be re-hung or adjusted. To correct the slope of the laundry room's floor, that corner of the House could be jacked up, eliminating the need to lift the entire House. Finally, one could re-pour the cement floor of the garage to make it higher and also raise the garage's header. Mr. Ewing indicated that all of the problems that Mr. Mahetta identified as being associated with the House's foundation being to low to the ground and not level could be fixed without lifting the House for an amount much less than $90,000. Mr. Ewing provided estimates for each of these repairs that, in the aggregate, totaled less than $10,000.

E. <u>Final Calculation</u>

The Court begins with $210,000, which is Mr. Brumbley's estimate before he took the $150,000 deduction as a result of relying on the Construction Report. It then subtracts $31,176.03, which is the largest amount of Mr. Mahetta's estimate that was not allocated to lifting the House. It also subtracts an amount of $10,000, which exceeds the amount Mr. Ewing estimated it would cost to (i) excavate dirt under the foundation, (ii) jack up the low corner of the laundry room, and (iii) re-pour the garage. Finally, the Court deducts $25,000, which Mr. Brumbley stated is the premium a buyer would need to receive as inducement to buy such a troubled House. This yields a minimum value for the House of $143,823.97,

and such valuation means that Mr. Ewing's second-priority mechanic's lien is fully secured.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Mr. Ewing's claim is fully secured. Ms. Bice must therefore treat his claim as such under her Plan.

An Appropriate order follows.

By the Court,

Dated: August 8, 2008

Brendan Linehan Shannon
United States Bankruptcy Judge